I think we're ready to go just we're going to go. She wants to move around. The next case on the docket is People in the State of Illinois v. Ted E. Price II, 512-0521. Mr. Green? I apologize for standing. I've had some surgery, so I'm just stretching my leg. May I please record, counsel? I'm Terry Green from Watts Frankfort. I was trial counsel for Ted E. Price and his charges against him. Ted E. Price, Jr. was a prison guard at the time of his charge and conviction in this case. And it was a case where he was... Excuse me, did you just say the defendant was a prison guard? Yes, ma'am. Okay. At the time that he was... That was his appointment, I'm sorry. Right. I understood that. I just didn't know that. At the time that he was charged and ultimately convicted in this case. He was alleged, or she was ultimately convicted of two counts of felony of criminal damage to property, being the property of his former girlfriend and her, at the time, chairman, being their two automobiles. Now, in this particular instance, our complaint, at least on appeal, is basically raising two issues having to do principally on the matter of discovery. This case had been pending in the circuit court for approximately a year before we went to trial. There was a pretrial order that had been entered where the parties were to exchange discovery, and they were to go ahead and ultimately we went to issue in the case. The testimony consisted principally of the complainants. It was mostly all lay witnesses. It was in the defense case where we brought up the police officers. And it was in this instance the matters occurred, or at least brought to light, to which we ultimately brought our appeal, complaining of the actions of the state. Now, we don't make objections to the actions of the prosecution or the police lightly, as we stated in the brief. We're all entitled to a fair trial, not a perfect trial. And in this instance, we believe that we were denied that because of what we ultimately perceived, and we complain of, as a cavalier attitude, one, of the police, and then two, of the prosecution in this case. Now, the issue we raised were basically having to do with an exhibit that was brought up in the state's aspect of rebuttal evidence, having to do with a receipt of an item of what we call paint stripper. And our other complaint has to do, or our other issue has to do, with the instrumentalities, or at least we believe it would be the instrumentalities, that committed the offense to which Mr. Price was convicted. Are you talking about the block? Yes, ma'am. The concrete block? The block, and also we raised the issue about the photograph of the can of paint. There were two automobiles in this case which were damaged. The evidence showed that on May the 27th that Teddy Price went and bought a can of paint stripper at Barnes Lumber in Harrisburg. Now, Mr. Price's father is a contractor, and he has an account there, and Teddy goes in there and he buys it and puts it on the father's account. That was on May the 27th. On May the 28th, there was damage done to the automobiles of the former girlfriend and her current boyfriend. Was there testimony it was paint thinner damage? It seemed to be presumed in the briefs. Well, the testimony was there was a statement from a girlfriend or female acquaintance of Mr. Price saying that he acknowledged that he had used some type of paint remover to do this damage. Had no expert from any police department testified? No, Your Honor. And there was a stipulation having to do with the damage, but even in the stipulation there was nothing as to whether or not it was basically the stipulation of an expert who examined the automobiles for the purpose of establishing value of the damage that were done to the two automobiles. Nobody contended that it wasn't paint stripper, some kind of caustic material that wasn't an issue? I argued that there was no evidence of what the substance was, but it was apparent from the photographs that were admitted to evidence that there was some substance placed on the automobiles which destroyed the paint. The testimony, as I said, was basically the lay witnesses of statements of former girlfriends of Teddy Price of what he allegedly he had said. Now, those statements didn't exactly line up. One said that he and another girlfriend had done it. The girlfriend denied that she had said that. I guess it was the third girlfriend that she had done it, but that Teddy had done it anyway. So in the defense case, we called the actual police, and it was at that time in cross-examination that the one police, the first officer who investigated the damage, testified that because of the broken windows, he looked in the broken window of one of the vehicles and saw a rock in there, or a mason block, I believe is how he described it. He took that into evidence down at the police station. He did not place that into his police report. There's no evidence received of it being taken into possession by the police officers, and he could not explain in trial either why he did not put it into his police report nor what became of it after he took it down to the police department. So did you learn that during your cross-examination or your direct of him? Yes, in my direct examination of the rock in the window. In the defense case? Yes, ma'am. It was, in addition, it was also, we called the investigator for the Harrisburg Police Department. Again, we called the non-law witnesses. The detective for the police department then testified to what he had done in his investigation, explaining to get him to lay witnesses of the action of Teddy Price. But it was at that time that we learned that he had gone to the home of this Denbo. Now, the timeline is May 27. Teddy Price buys a can of paint stripper at Barnes Lumber, places it on his father's account, Teddy Price Sr. May the 28th was the morning the vehicles were found damaged. On May the 30th is when the investigator goes to Mr. Denbo's house. He had heard, I guess from some of these other lay witnesses, that Teddy Price had taken a can of paint stripper over to Matt Denbo's house at some point in time. He goes over there. Now, it's in my direct examination of this hostile witness that we find out that he went to Matt Denbo's, observed the can of paint stripper that supposedly Teddy Price had brought over to Mr. Denbo's house. We also learn in his testimony at that time that he had made photographs of the can and did not take it into his possession at that time. Did he say whether the can was full or empty? Your Honor, I want to say that he said that it was, but I seem to recall he said that it was full. I'd have to rely on the transcript, and I don't have it with me right now. That's my memory, but I could be mistaken. Ultimately, after the conclusion of the police officers and their testimony, showing basically the errors of their investigation, that the court then recessed the case. Before the recess, then we rested. There was a lunch hour at the conclusion of the lunch hour, and then we went ahead on the record and rested. We advised the court before that we were going to rest. And then the state started its rebuttal case, and it called basically Mr. Barnes to testify that over the lunch hour, he had located. During that morning that we were examining the police officers, that he got a call from the investigator of the state's attorney's office. They'd gone through and arranged through, I assume, his computer cataloging system to print out a receipt, which is already clear in our appendix, being the, showing the date, I believe, of June the 4th, which was the date the second can was purchased, which was several days after. Now, our complaint was that, one, the attitude, the cavalierness that we felt of the prosecution in preparing this case and providing us the scope. It does appear pretty sloppy, but how do you believe you were prejudiced, or how did it affect the fairness of your trial or the outcome? Well, trials are as difficult as they are when you have the evidence. The rules of discovery generally require that the state, if it's going to use anything against a defendant, that it make that evidence available to the defendant. In this instance, we believe that by this introduction of this late exhibit that we did not get notice of until Mr. Barnes was on the stand, they marked the exhibit and discussed the exhibit at a time when I stood up and objected to it since I had never seen this, was that it played into the argument that the government, that the state had, that Mr. Price, in an effort to cover his tracks, was bought a second can of paint stripper. What about the fact that this is rebuttal, and how would they anticipate this, necessarily? Well, as I recall, this was stated in the opening, as I recall, the state's opening, that the testimony of Mr. Barnes was about his inventory, and that he had two cans of paint stripper in his inventory in May at the time of the commission of the offense, that one was purchased by Teddy Price on the 27th, and that the second can then was purchased shortly thereafter. By Mr. Price? Well, the state... I thought it was purchased by someone else. No. It was purchased by Mr. Price? The second can? Yeah. Well, no one knows who the second can, the allegation or the argument being that the state was that Teddy had bought a second can. But I didn't understand that timeline then, because what confused me is if the police officer sees it on May 3rd or 30th, and it's not bought until the 3rd, how do these cans even relate? That's number one. And number two is, I didn't think this was rebuttal. Did you put on evidence that there were two cans, or did the state? No. I put on that the police had... of the paint stripper can on May 30th at Mr. Denbo's house by the police. So you didn't raise the issue of two cans? No. Because the state claims that you raised it, and that's why Jeff Baker was a rebuttal witness. I don't see how he's a rebuttal witness if it fit into the state's plan from the get-go. Well, he testified to it in the case in chief. The two cans? The state's case in chief, that he had two cans, and that one was purchased by Teddy Price prior to that time, and then the second can was purchased later. Which doesn't make your rebuttal, then, to bring this document in. Right? Well... Or does it? Well, it's kind of hard to determine. What about the... I didn't use a pistol anyway, but that's... What about the disclosure of these documents by the state on the second day of trial? Well, that was why I placed that in the statement of facts in the brief. They amended the pleadings after, but I had not filed a bill of fatigue first. So there was an amendment to the pleading after the first day of trial with the jury selection. Then, after we've already had witnesses on it, and right a few minutes before the girlfriends of the testifier, the former girlfriend, excuse me, then I get this stack of papers of communications between Teddy Price and this Ms. Stroud, and I didn't even have an opportunity to examine it prior to her being placed on the witness stand. So I objected to it. I mean, if those had been available before trial, then they would have been available either to query my client about, or to seek to investigate about, or be used in a planned cross-examination of the quote-unquote victim. And did you raise that issue in the post-trial motion? Yes, ma'am. As I recall, I did. I don't have the post-trial motion right now. Okay. But, as I said, we're not entitled to a date. I want to ask you about the exhibit, about the second panel of paint remover. I have a note that it appeared that it was created for the purpose to show that there was a receipt, and that's why it had the later date on it, the date post-purchase. Okay. The day at the top, as I understand it, 6-8-12-12-29. Which is? That's the day that we were in trial. Right. The last day of trial. So, obviously, it was not of that date. Right. Then, if you look at the last line, as I understood it, or understand it, it has the quantities in the left-hand. This is exhibit 6, showing that two cans have been taken out of the stock inventory. Okay. Then, the last sale, as I understood, was on 6-3. Mr. Barnes. The last sale of this item was 6-3-11. Uh-huh. The last receipt, which was 5-27, which is this receipt, which we had been given at discovery, was the 5-27. So that was an argument that this was an actual record that was made for purposes of testimony, not an exhibit that was made in the business. And what that did is substantiate the, we believe, the unfairly to us testimony of Mr. Barnes. Who said he did, in fact, come in and buy the second one? No. He did not. So it's unknown who purchased the second one, if anyone did, related to the — It was never established who the second one was. And as I say, as I recall in the argument, this could be used to show a — Cover-up type. Yes. Some type of attempt to cover-up. Because the testimony of Mr. Barnes is the stuff that sat on his shelf since it entered into his inventory on September 13th of 2009 and sat there for almost two years. And then both cans were, left his office, excuse me, left his business in four days' time or five days' time. So, now, Counselor Herbert, the government, the state — You'll have an opportunity to come back. Thank you. Ms. Shanahan. May I please report? Counselor. My name is Sharon Shanahan, and I represent the people of the state of Illinois. The first thing I'd like to clarify is in regard to the computer. See, this most definitely was presented by the state in rebuttal. I understand that rebuttal is the order of trial. But what was it rebutting? The fact that the defendant focused strongly on the fact that there was this second can of paint thinner that came out. His testimony or examination of Officer Astetti was about whether he got the can of paint thinner from Matt Denbo's house and what day he went out there and tried to establish the existence of a can. There was no can in a photograph that had gone missing. No. Well, yes. That's one can. Although the police officer said that the can was probably still at Matt Denbo's house. Okay, but that's one can. I didn't see — I don't — and I haven't read the record, so — but I don't see where the defendant put on the case of two cans. I thought it was the state. No, Your Honor. The state never mentioned the second can. The only mention of the second can in the state's case in chief was an unsolicited, unresponsive statement by one of the victims that Mr. Denbo's — Matt Denbo's where this second can of paint thinner supposedly was found. And his sister was asked, did the defendant admit — I'm paraphrasing here, but basically she was asked, did the defendant admit to pouring the paint thinner on the car? And her response was he went and found — got another can so that they would think he covered it up. And it was not — the question the state had asked was simply, did he pour a paint thinner on there? Her response mentioned the second can of paint thinner. That's the only time the state — and again, the state did not — How interesting. But it's the only time it was even mentioned in the state's case in chief. Is it true, though, that the reference to the photograph taken by the officer of the can was not in his report? Yes. So when this misinformed answer came forward, nobody knew at that time that there had been a photograph of a can taken at Matt Denbo's house. Well, I think we need to get to the issue that the defendant has raised on appeal here, and that is a discovery violation, that he should have had this — either had this received earlier because it shows the sale of a second can of paint thinner. That's his issue on appeal is a discovery violation. I thought it was also the failure to notify them of the lost photograph and the lost block. Well, that's the second issue. Mason block, and the third issue. Well, we've got two issues. Okay. We've got a discovery violation. He says that this receipt, this computer record, should have been disclosed. That's issue number one. And that's the way the defendant frames the issue is a discovery violation. And we need to therefore look at case law dealing with how do you deal with discovery violations. First of all, if the state gives the defense counsel the opportunity to stop the trial, he can then go talk to the owner of the laundry yard, who is the custodian of the records. He can determine whether he needs to do anything further. He needs to get an expert. He needs to get a continuance. You give him the opportunity to do that. Well, first of all, that's the very first thing that happened is that the trial judge said, okay, do you want to do something about him? He said, no, I don't. I don't. He didn't. It could have been sent in front of the jury. The cat was out of the bag, wasn't it? You pull out a document instead of taking it over to defense counsel to show it to him? I don't think that's what the record reflects. I believe what it reflects is that at least in my mind as reviewing my notes before this happened, it said that my notes say that this came up, the defense counsel in his case in chief, which dealt with the second can right before lunch. Then during lunch, the jury is excused, and they have the jury instruction conference. And then right before the case comes to back, they go back to the jury. The state's attorney has given this receipt of her. This is not a receipt, by the way. It's just an inventory record. But it was kept on the computer in the ordinary course of business. So the defendant brings up the question of the existence of the second can of stripper. When was it sold? When was it purchased? Who bought it? That comes up in the defendant's case in chief. Then we have this lunch hour, which is the state's attorney is picking up these jury instructions. Then just before they go back in, the state's attorney has given this. He gives it to defense counsel before any questions were asked. Now, again, if he needs to, as I quote, he was given the opportunity. He was given the opportunity to talk to the owner of the laundry yard. He was given the opportunity to, he could have asked for a continuance. He did not ask for a continuance. He didn't want to do anything that cures a discovery violation. There are cures for discovery violations. If this was a discovery violation, there are cures for it. And defense counsel chose not to take any of those. And to say that he couldn't cure this violation is rather absurd. Because what he was entitled to do was to talk to the custodian of the records. He didn't want to do that. He said what he needed to do was to go to the business and look at the computer. Well, I disagree with that. I don't think that's what Rule 803 says. But even if he thought that was true, then he could have asked for a continuance. He didn't do that either. He didn't want any, he didn't want to cure this. He just wanted to complain about it. And in discovery violations, the effort is to cure. And finally, I would really like to point out that the state's theory of the case was never that the defendant went out to buy this second can of paint to cover up the fact that he, I guess what they're saying is if there's this full can in Matt Denbo's garage, then the defendant could, would be more likely to, excuse me, if there's a can in Matt Denbo's, well, I'm confusing myself. The state never attempted to lay anything on this second can at all. The state's theory of this case was that the defendant was very jealous, that he had a history of being pretty hard on his ex-girlfriends, and that the paint was thrown onto the cans the day after. There is no doubt that the defendant purchased a can of paint stripper on May 27th, and there is no doubt that very early on May 28th, the cars were found with the paint bubbled up, the window broken, and there was no doubt that the defendant told at least two and perhaps three people that he had poured paint stripper on these cans. That's the state's theory of the case. Whether there was a second can or not doesn't really matter, so there we go to the final issue that the state raises in our brief, which is that there was no prejudice to the defendant. The fact that there's a second can doesn't hurt anything. Now, when you go to the rock in the picture, which the defendant raises in his second issue, the United States Supreme Court has said in Arizona v. Youngblood that unless a criminal defendant can show bad faith on the part of the police, then the failure to preserve potentially useful evidence does not constitute a denial of due process. That's the argument the defendant is making in the second issue is a due process violation based on Arizona v. Youngblood. The United States Supreme Court went on to say that the applicability of the bad faith requirement depends on the distinction between materially exculpatory evidence and potentially useful evidence. So even things like fingerprints are potentially useful. Now, to say that you could even take a fingerprint off of a rock or a piece of, this was apparently a piece of a block, not even a whole thing. To even say that you could take a fingerprint off that is a bit of a stretch. But in any case, the most you could say about it is that it's potentially useful. And defense counsel says in his brief at page 15, the exculpatory nature of the evidence was apparent. Otherwise, the police would not have taken the items into their custody. Well, first of all, if the police did take the rock and the picture, it's far more likely that they thought they were inculpatory, not exculpatory. And that they certainly cannot be said to be materially exculpatory. The state did not have to prove how that window was broken. They had to prove the defendant broke it. They didn't have to. Do you think that Brady v. The State of Maryland is still good law, which says that where the prosecution withholds evidence that's favorable to the accused, it violates due process if the evidence is material to guilt or to punishment, regardless of the good or bad faith of the prosecution? In other words, you don't have to show bad faith to have a violation of due process if the evidence is material. Materially exculpatory, I believe. Material exculpatory. That's what Arizona v. Youngblood says. That's what Illinois v. Fishers says. And your opinion is this was, if anything, inculpatory. Yes. But it's not your theory of the case that controls. I mean, the defendant, if that can had been full, the one that was photographed, we know the second can wasn't really bought until June 3rd. And this is a full can found on May 30th. If it's full, how could it be used to damage the cars? So from a defendant's point of view, it could be exculpatory is what I'm saying. Well, I believe you'll see that the police officer wasn't quite sure what day that he went to the shed and photographed this can. Which makes it bad or better. It doesn't make it materially exculpatory. Again, we get back to the fact. Let's just take these. I mean, if fingerprints are not materially exculpatory, and that's what I believe was at issue in Arizona v. Youngblood was fingerprints. But here we have the evidence. The evidence was present. There was a police officer present who took a photograph. And I don't know if he's going to say if it's full or not full. And through no fault of his own, or through no fault of the police department, it was lost. Now, the Illinois Supreme Court has said that loss of evidence, which is inadvertent, and there's no indication that the evidence is treated differently than evidence in any other case, is not a denial of due process. That's People v. Harris. But this officer didn't handle it as other evidence would be handled, where you'd tag it, you'd collect it, you'd tag it, you'd bag it. He took it on his cell phone and something happened to the SIM card. Isn't that what happened in this case? I mean, he took no effort to follow normal police procedures as to the can, although he thought it was the can. Am I understanding that correctly? He was told that there was another can of paint that are out there. He went out and talked to them and took a picture of it. That's pretty much all there was. There's no indication as to whether he thought that was the can or not the can. The testimony of trial doesn't establish that. But we don't need to. So we have the two items that are discussed here, the rock. Again, as I said, the state doesn't have to establish how the car was broken, and certainly the most defense counsel suggests that it might have fingerprints on it. And given the fact that the timeline is defendant purchases the paint stripper evening of the 27th, very early in the morning of the 28th, the cars are damaged, bubbled paint, which I think is quite strong evidence of paint thinner causing the damage. And then windows broken at the same time. And the testimony of admissions defendant made that he did this. So the rock is, as I said, at most potentially useful. And the picture is at most potentially useful. Defendant doesn't argue that he was denied due process by not having the can. He says he was denied due process by not having the picture. That's the argument. And the only thing that picture shows is that there was a can of paint stripper at Matt Dindo's house after the victim's cars were damaged. Now, isn't there also a statement by somebody that he told them that that's why he bought the second can of paint? Yes. Okay. And who was that? That was Julie Dindo, who was the sister of Matt Dindo, which is where that second can was located. And there was also a statement, testimony, by Mr. Barnes that he was told to keep this all quiet, his purchase of paint stripper. When the defendant made the first purchase, he said, keep it on the down-low. That's what he, when he, see, he was charging it to his father's account. He didn't pay. The two cans of paint stripper, one was charged to defendant's father's account. And Mr. Bakers definitely knows that the defendant came in and charged it to his father's account. Did we know that the second purchase was cash? Is that something that's shown? Yes, the second purchase was cash. There is no, no one, no one knows who bought the second can. There's not a receipt. And so I'd like to go back and, because I feel like we tend to get away from the issues that the defendant has raised in this case. His first issue is a discovery violation for this inventory receipt taken off the computer. He says that he should have had it in discovery. And the question we look at there is, first of all, it was not, the state did not see the need. In fact, it's kind of interesting. I was looking through my notes here that it says in an answer to discovery in October 2011, the state intends to use the 527 receipt. So clearly they did not intend to use the picture. They did not intend to use the block. They did not intend to use anything else. It was only when the defendant brought up the question of the second can that. Well, are you saying the state knew about the lost evidence and just didn't tell? Oh, I didn't think so. And even the defendant says there is no, I mean, the defendant admits that the state didn't intentionally do anything. Right, and that's why it wouldn't have been answered. But my question is, if it's truly rebuttal evidence, how can it be a discovery violation? Because you don't know you need it until you get to rebuttal. Yes, that's correct. That's why I keep asking was this truly rebuttal. I believe it was. I believe that this is an issue that the defense counsel raised in his case of chief and the state brought in an admissible document. And that your fallback position that even if it weren't that there was a cure. Which he chose not to. I mean, he absolutely chose and the Illinois Supreme Court says that that means that he forfeited any claim. Thank you very much. Any rebuttal? Just on a couple of points. Okay. If I'm an error on the record, then I apologize. Is it related to the, I don't believe the record reflects as counsel said, that this was done outside the presence of the jury. Because as I recall the record and as I recall the trial, it was only after the objection. Mr. Barnes had already been on the stand and the matter had already been marked. That the judge gave me the opportunity for a continuous. At that point, the counsel made the point, as I said I'll be brief. It was in Ms. Denbo who was a witness for the state that mentions the second can. Now if they had this information of Ms. Denbo, this is Matt Denbo's sister or former paramour as it was of Mr. Price. Then they knew of a second can. They should have had this can, or excuse me, they should have had this record that they weren't trying to put in rebuttal at a later time. But is it true that the second can came up as kind of a non-responsive answer? It doesn't seem that it was the focus of their case. Well, whether. I mean I wasn't there, so. Because my question before is if they clearly had the document made during lunch, right? Yes. So in documentary evidence that's created especially for rebuttal, it doesn't seem that you would even know you need it until the time you make it. So how can it be a pretrial discovery violation is my question. That's why I'm wondering about this two can theory. And if I'm in error, did she brought it up and whether or not that was me? Whether that answer from Ms. Denbo can be considered a surprise that the state is unresponsive. Then they had it over the lunch hour. They could have made it available at that time, but they elected not to do it. That's true. They just went back to the same thing they did with the great list of texts and Facebook on the second day of evidence, the actions. Counsel also talked about, well, it was a photograph. Well, you know, if you have a photograph or photographs have dates and times on them, they have the ability of having those raised. If we'd known such a thing existed, maybe we would try to subpoena the phone of this man to see if it could have been. Tested to find the date that he was at MacDenmo's for the determination of the. This can paint stripper, he saw MacDenmo's if it was before or after. Whenever the second can was supposed to be purchased, if it was before the second receipt or whatever it was, then. It would have shown that that was the can that allegedly the state was saying was that it was used on the automobiles. So. We think while we said, yes, we can't say that the state went out of its way to do these things. I think at some point in time, a lack of day's latitude to an order of discovery rises to a level. Close to what? The Taylor versus Illinois case where if you keep bringing up things last second, there might be a belief that you're trying to keep things from the other side. And the evidence shouldn't be admissible. So we think that all told. Thank you, sir. Okay. This matter will be taken under advisement. Nothing further to come before the court. We're adjourned.